**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| C-4 ANALYTICS, LLC<br><br>Plaintiff,<br><br>v.<br><br>SAMUEL DUFF and L2T MEDIA LLC,<br><br>Defendants. | CIVIL ACTION NO. ________________ |

**COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES**
**AND JURY DEMAND**

Plaintiff C-4 Analytics, LLC ("Plaintiff" or "C-4") by and through its attorneys, for its Complaint for Equitable Relief and Damages against Defendants Samuel Duff ("Duff") and L2T Media, LLC ("L2T") (collectively, the "Defendants"), alleges as follows upon personal knowledge as to its own acts and upon information and belief as to all other matters:

**INTRODUCTION AND NATURE OF THE ACTION**

This action arises out of Duff's breach of multiple post-employment obligations set forth in a series of agreements containing restrictive covenants that he signed with Plaintiff in exchange for employment and monetary compensation (collectively the "Agreements") dated February 23, 2016; December 12, 2016; and May 11, 2017 (the "Operative Agreement"). Copies of the Agreements are attached hereto as Exhibits A through C (in chronological order).

C-4 is a full-service digital marketing and sales development company serving automotive dealerships throughout the United States and Canada. C-4 helps dealerships increase vehicle sales and market share through digital advertising, lead generation, customer acquisition strategies, and other marketing services. C-4 operates in a highly competitive industry in which success depends

not only on attracting new dealership clients, but also on maintaining long-term relationships with existing clients, obtaining referrals from those clients, and consistently demonstrating measurable value.

Duff was employed by the Plaintiff as C-4's Senior Business Development Representative. In that role, Duff cultivated relationships with prospective dealership customers. He worked closely with the sales team and executive management to identify qualified leads in order to drive business growth. He played a critical role by making first contact with C-4's prospective clients and winning appointments for C-4's sales employees to present C-4's unique value proposition. By the time Duff left C-4's employ, he was leading C-4's business development function and was its largest producer of qualified sales opportunities. Duff occupied one of C-4's most strategically significant revenue-generating roles at the time of his departure. Duff served in a position of trust and had access to C-4's highly confidential and proprietary information, including customer lists and identities, customer needs and preferences, prospects, pricing and technical data, training data, C-4's business methods, and other types of information which is not generally known to the public.

Duff provided C-4 with notice of his resignation on or about June 8, 2026. Despite his contractual obligation to notify C-4 of his subsequent employment, Duff did not tell C-4 where he would be working. Over one month after his resignation, on July 17, 2026, Duff informed C-4 that he had accepted a position with C-4's direct competitor, L2T, where he is building L2T's business development function. In doing so, Duff is necessarily using C-4's confidential and proprietary information.

Duff's employment with L2T violates the express terms of the post-employment restrictive covenants in the Agreements. Duff's actions in failing to inform C-4 of his subsequent employer confirms his intent: to utilize C-4's confidential information at L2T in efforts to compete directly

with C-4. Duff's activities are not only improper competition, but are in flagrant disregard to the covenants in the Agreements, and the harm to Plaintiff is immediate and irreparable. Further, Duff's employment at L2T places C-4's confidential information and trade secrets at substantial risk of disclosure and use in violation of the Massachusetts Trade Secrets Act, M.G.L. c. 93, § 42 *et seq.* ("MTSA"), and the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq.* ("DTSA"), and further constitutes a breach of Duff's duty of loyalty to C-4.

Moreover, in addition to employing Duff, L2T has engaged in a pattern and practice of recruiting and/or soliciting employees, including Duff, away from C-4 in violation of their own noncompetition and/or nonsolicitation agreements. L2T's conduct constitutes tortious interference with contractual and/or advantageous business relations and a violation of Chapter 93A, §§ 2, 11.

Plaintiff seeks an order enjoining Duff from working at L2T for the tolled restrictive period of one (1) year; prohibiting Duff and/or L2T from disclosing or otherwise using Plaintiff's confidential information; and prohibiting Duff and L2T from interfering with Plaintiff's contractual and/or advantageous business relations; damages; and any additional relief this Court should order as set forth in the Request for Relief below.

## PARTIES

1. Plaintiff is a Massachusetts limited liability company with its principal place of business in Wakefield, Massachusetts.

2. Defendant Duff is an individual who, upon information and belief, resides in Wakefield, Massachusetts.

3. Defendant L2T is an Illinois limited liability company with its principal place of business in Evanston, Illinois.

## JURISDICTION AND VENUE

4. The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff asserts claims under the DTSA. Plaintiff's remaining and related claims fall within this court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

5. Personal jurisdiction exists over Duff as he is domiciled in Massachusetts and because he expressly consented to the jurisdiction of the state and federal courts of Massachusetts pursuant to the Agreements, which provide in relevant part that Duff "consents and submits to the jurisdiction of the . . . federal courts of Massachusetts for any dispute concerning or arising out of this Agreement." (Exhibit C, Section 13).

6. Personal jurisdiction exists over L2T because L2T has purposefully transacted and conducted business in Massachusetts and has established substantial contacts with Massachusetts. Among other things, L2T knowingly hired Duff, a Massachusetts resident, to perform services for L2T from Massachusetts; entered into an employment relationship with Duff in Massachusetts; communicates with, directs, and compensates Duff in Massachusetts in connection with that employment; conducts and solicits business in Massachusetts; and otherwise purposefully avails itself of the privilege of conducting business within Massachusetts. Plaintiff's claims arise out of or relate to L2T's Massachusetts contacts, including its employment of Duff and the conduct alleged herein. Accordingly, L2T could reasonably anticipate being haled into court in Massachusetts.

7. Venue is proper pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### *C-4's Business*

8. C-4 is a leading provider of automotive digital marketing and advertising services. C-4 assists automotive dealerships with increasing their sales and market share.

9. C-4 helps dealerships increase their sales and market share through digital advertising, lead generation, customer acquisition strategies, and other marketing services.

10. C-4's success depends not only on attracting new dealership clients, but also on maintaining long-term relationships with existing clients, obtaining referrals from those clients, and demonstrating measurable value to those clients.

11. Since its founding in 2009, C-4 has obtained a competitive advantage by developing proprietary sales methodologies, marketing strategies, pricing models, customer acquisition techniques, business development processes, and internal playbooks. This has been done over a long period of time and at great expense and effort by C-4. C-4 has also accumulated significant institutional knowledge regarding the needs, purchasing habits, renewal cycles, and decision-making processes of automotive dealerships. This information is not publicly available and cannot be readily duplicated by a competitor without significant expense and years of experience.

12. C-4 takes significant measures to protect its confidential information. Depending on an employee's role, access to particular systems, documents, and data is restricted through C-4's information technology systems and user permissions. C-4 also requires employees with access to confidential and proprietary information, including Duff, to execute agreements obligating them to protect that information both during and after their employment. Employees are informed that Company documents, customer information, pricing information, sales materials, business strategies, and other proprietary materials belong exclusively to C-4 and may not be copied, retained, or used for any purpose other than advancing C-4's business. C-4 also maintains policies and procedures designed to safeguard confidential information, including restricting electronic access to Company systems, monitoring the use of Company-issued devices and accounts where appropriate, and maintaining electronic records reflecting employee access to Company

information. These measures are intended to prevent unauthorized disclosure or misuse of C-4's confidential business information.

*Duff's Employment*

13. Duff first became employed by Plaintiff on or about February 23, 2016, as a Business Development Representative.

14. Effective July 3, 2018, Duff was promoted to the position of Senior Business Development Representative. Duff held this position until his resignation from employment on or about June 12, 2026.

15. In his role as Senior Business Development Representative, Duff was responsible for identifying qualified leads in order to drive business growth by making first contact with prospective customers and winning appointments for the sales team. By the time Duff left C-4's employ, he was leading C-4's business development function and was its largest producer of qualified sales opportunities. Duff occupied one of the Company's most strategically significant revenue-generating roles at the time of his departure.

16. Plaintiff and Duff initially entered into the first of the Agreements upon hire on February 23, 2016. (Exhibit A).

17. Plaintiff and Duff entered into a subsequent Agreement on December 12, 2016. (Exhibit B).

18. Plaintiff and Duff then entered into the Operative Agreement on May 11, 2017. (Exhibit C). The Operative Agreement stated that it was "in consideration of the Employee's employment with the Company and for the training, compensation, bonuses and other benefits now and hereafter paid to Employee by the Company." (*Id.*, page 1).

19. In his role as Senior Business Development Representative, Duff served in a position of trust and had access to C-4's highly confidential and proprietary information, including customer lists and identities, customer needs and preferences, prospective client information, pricing and technical data, training data, C-4's business methods, as well as information concerning lead generation, dealership targeting, customer relationship management ("CRM") data, sales pipelines, internal sales analytics, and other types of information not generally known to the public.

20. Because C-4 competes directly with other digital automotive marketing companies for the same dealership customers, disclosure or use of this information by a competitor would provide that competitor with an immediate and unfair competitive advantage while causing significant harm to C-4.

21. Duff is intimately familiar with C-4's confidential business strategies regarding marketing and advertising for automotive dealerships. This is a highly specialized and competitive industry in which C-4 has built a national presence.

22. C-4's relationships with its dealership clients and prospective clients are cultivated over many years through consistent communication, trust, and successful business performance.

*Duff's Post-Employment Obligations*

23. In the Operative Agreement, Duff agreed to various post-employment restrictive covenants. Duff agreed that during his employment and for a period of twelve (12) months after his employment ended, he would not "directly or indirectly, render services (whether as an

employee, consultant, independent contractor, owner, member of a board of directors, or in any other capacity) to a Competing Organization."[1] (Exhibit C, Section 5(b)).

24. In the Operative Agreement, Duff further agreed that during the term of his employment and for all times thereafter, he would not "disclose any Company Confidential Information or use it in any way, except with authorization and on behalf of the Company, whether or not such Confidential Information is produced by the Employee's own efforts."[2] (*Id.*, Section 4).

25. Duff further agreed in the Operative Agreement that he would not "contact any individual or entity that was a Customer or a Prospective Customer of C-4 Analytics and that Employee serviced, had contact with, learned the identity of, or learned Confidential Information about during his/her employment at C-4 Analytics, for the purpose of soliciting the sale of Competing Services to such individual or entity and/or to divert any portion of that individual's or entity's business away from C-4 Analytics."[3] (*Id.*, Section 5(c)(ii)). Duff made a similar agreement

---

[1] "Competing Organization" is defined as "any person or organization, including Employee, engaged in, or that intends to become engaged in, the providing of the production of Competing Services." (Exhibit C, Section 5(a)(ii)).

[2] "Confidential Information" is defined in Section 4 of the Operative Agreement as "all original and copies of all material, data, documents, and information in any format (including without limitation all hardcopy, softcopy, electronic, web, and computer-based information, documents, data files, records, videos, pictures, and recordings) which constitutes confidential and/or trade secret information as further defined in this Agreement and/or under Massachusetts law." Section 4 of the Operative Agreement provides a non-exhaustive list of such Confidential Information, which also includes "Client Confidential Information," defined as "the trade secrets and confidential information of the Company's clients, information pertaining to the clients' products and the like, as well as the existence, details, terms and conditions of the clients' relationship with the Company."

[3] "Customer" is defined as "any person, client, entity or organization, subsidiary or affiliate thereof with which C-4 Analytics has or had a contract, engaged in any business with, or for which C-4 Analytics has performed any work, provided products, or provided services, during the twenty-four (24) months prior to termination of Employee's employment." "Prospective Customer" is defined as "any person, entity or organization, subsidiary or affiliate thereof to which C-4 Analytics had definite plans to solicit, provided proposals or estimates to, or has otherwise solicited business from during the twenty-four (24) months prior to termination of Employee's employment."

for any "Referral Source" or "Prospective Referral Source" of C-4.[4] (*Id.*, Section 5(c)(iii)). Duff further agreed he would not "interfere with C-4 Analytics' contracts, relationships, or prospective contracts or relationships, including but not limited to, with C-4 Analytics' Customers, clients, patients or referral sources." (*Id.*, Section 5(c)(iv)).

26. Duff further acknowledged that any breach of the Operative Agreement would "cause irreparable injury to the Company, that the Company's remedies at law will be inadequate in case of any such breach or threatened breach, and that the Company will be entitled to preliminary injunctive relief or other injunctive relief in case of any such breach or threatened breach." (*Id.*, Section 6).

*Duff Resigns from C-4 to Join L2T*

27. On June 8, 2026, Duff provided C-4 with two weeks' notice of his resignation.

28. Prior to his resignation, Duff did not inform C-4 that he intended to begin employment with L2T, a direct competitor of C-4.

29. On the same day of his resignation, C-4's Chief Human Resources Officer Candace Cooper spoke with Duff and asked him where he would be working after leaving C-4, information that he is required to provide to C-4 pursuant to the Operative Agreement. Duff did not provide Cooper with this information.

30. On June 9, 2026, Cooper provided Duff with a copy of the Agreement and reminded him of his post-employment obligations via email. Cooper also reminded Duff of a follow-up meeting scheduled for Monday, June 15, 2026, between the two of them.

---

[4] "Referral Source" is defined as "any person, entity or organization, subsidiary or affiliate thereof that had referred Customers or business opportunities to C-4 Analytics." "Prospective Referral Source" is defined as "any person, entity or organization, subsidiary or affiliate thereof that C-4 Analytics had definite plans to solicit, provided proposals to, or had otherwise pursued for the purpose of establishing a referral relationship to develop additional new Customers or business opportunities."

31. On Sunday, June 14, 2026, Duff declined the Google Meet invitation that Cooper had sent for the June 15, 2026 meeting. Cooper responded by email to inquire about why Duff had declined the meeting and to offer to schedule a new time for the meeting.

32. On June 15, 2026, Duff emailed Cooper stating in relevant part that C-4 could "move forward" with ending his employment and that he would return his computer when he returned to the area the following week. Cooper followed up less than an hour later stating, in part, that she and Duff "still need to connect on where you [Duff] are going, as that is required per the agreement. If you'd rather, you can email this to me. Otherwise, let's keep the 15-minute check-in."

33. Duff did not respond to this email from Cooper on the morning of June 15, 2026, and did not work out the full two weeks' notice he provided in his resignation letter.

34. Later that same day, Cooper emailed Duff with offboarding information. She again reminded him of his post-employment obligations under the Operative Agreement and provided it to him. Duff never responded to this email despite Cooper's request.

35. Cooper also called Duff in this timeframe in an effort to reach him. Duff did not answer or respond.

36. Upon information and belief, Duff declined the meeting on June 15, 2026, and ignored email and phone communications from Cooper in an effort to conceal that he was going to work at L2T, a direct competitor of C-4.

37. On July 16, 2026, over one month after Duff's resignation, Chief Executive Officer Michael Weiss spoke with Duff via telephone. During this call, Duff identified – for the first time – that he was working at L2T. Duff further stated that he faced no geographic restrictions on his activities at L2T and could contact dealerships anywhere in the United States, which would mean

he was necessarily calling dealerships within the restrictions set forth in the Operative Agreement. Duff further stated that he had been tasked with building L2T's business development function from the ground up.

38. During this call on July 16, 2026, Duff agreed to a follow-up call with Weiss on July 20, 2026. Duff did not answer or respond to Weiss's call on July 20, 2026.

39. L2T is currently employing Duff in violation of his post-employment obligations set forth in the Operative Agreement.

40. Upon information and belief, Duff's duties, services and/or responsibilities at L2T are the same or substantially similar to any duties or responsibilities he performed for C-4.

41. Upon information and belief, Duff's duties, services and/or responsibilities at L2T are such that he is likely or probable to use or disclose C-4's confidential information in performing them.

42. L2T is a "Competing Organization" providing "Competing Services" within the meaning of the Operative Agreement.

43. Both C-4 and L2T provide digital marketing and advertising solutions to automotive dealerships, including services designed to increase dealership sales, generate consumer leads, improve online visibility, and grow market share. Both companies market their services to substantially the same universe of dealership customers across the United States and compete to win new dealership accounts and retain existing ones.

44. L2T markets itself as a "premier AI-powered ad tech company," which "pair[s] technology with expert strategy to drive qualified shoppers to [a] dealership." *See* https://l2t.ai/. Their website further states, "L2T was founded to address a critical need in automotive digital

advertising, delivering software solutions shaped by real industry experience.” *See* https://l2t.ai/about/.

45. Permitting Duff to be employed by, and continue his employment with, L2T would give L2T an unfair competitive advantage in as much as it is inevitable that Duff will, in the performance of his duties for L2T, use and disclose C-4’s trade secrets and confidential information and harm its goodwill.

46. On July 24, 2026, C-4 sent a demand letter to Duff outlining its belief that he had violated the Operative Agreement and sought assurances regarding his obligations.

47. On August 13, 2026, Duff responded. In the response, Duff did not provide the assurances sought by C-4.

*L2T’s Pattern of Corporate Raiding of C-4’s Employees*

48. Upon information and belief, L2T has engaged in an ongoing and concerted effort to solicit, recruit, entice, encourage, and/or hire employees of C-4 in a manner that violates the employment agreements those employees hold with C-4.

49. To date, these employees include Bryan Wong; Brandon Brillhart; John Rivera; Riley Whitmer; Michael Von Behren; and Duff.

50. Upon information and belief, Mr. Rivera currently reports to Mr. Brillhart at L2T.

51. Upon information and belief, Mr. Whitmer and Mr. Von Behren are no longer employed by L2T.

52. Each of these employees entered into employment agreements with C-4 whereby they were prohibited from soliciting C-4 employees and were obligated to protect, and not disclose, C-4’s confidential information.

53. Upon information and belief, L2T has engaged in a targeted, intentional effort to extract information regarding C-4's confidential business practices under the guise of legitimate hiring in order to unfairly compete with C-4.

54. On July 20, 2026, C-4 sent L2T a demand letter outlining L2T's illegal conduct and C-4's belief that L2T had engaged in tortious interference with contractual relations and acted in violation of Chapter 93A.

55. On July 30, 2026, L2T's attorney sent a response to the demand letter denying any liability; providing inadequate assurances; acknowledging that L2T and C-4 are competitors; and otherwise failing to address the substantive allegations set forth in the demand letter.

## COUNT ONE
## BREACH OF CONTRACT (Against Defendant Samuel Duff)

56. Plaintiff repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

57. The Agreements attached as Exhibits A-C are valid and binding contracts between Plaintiff and Duff.

58. Each Agreement was made for valid consideration.

59. Each Agreement is reasonable, consonant with public policy, and is necessary to protect the legitimate business interests of Plaintiff.

60. Each Agreement is reasonably limited in scope and narrowly tailored to protect Plaintiff's legitimate business interests.

61. Plaintiff has a clearly ascertainable right to protect its goodwill, confidential business information and trade secrets and to enforce the Agreements' restrictive covenants.

62. Duff breached and/or will breach his contractual non-competition obligations by providing services to and on behalf of Defendant L2T and by virtue of the nature of his employment with Defendant L2T.

63. Upon information and belief, Duff breached and/or will breach his contractual non-disclosure of confidential information obligations by utilizing C-4's confidential information during his employment with Defendant L2T.

64. Duff breached his contractual obligations by not informing C-4 of his subsequent employment (including the name and address of employer, and titles and duties of his position), despite C-4's attempts to obtain this information during his resignation from C-4.

65. Upon information and belief, Duff breached and/or will breach his contractual non-solicitation of customers, prospective customers, referral source or prospective referral source obligations by contacting such individuals and/or entities during his employment with Defendant L2T.

66. Plaintiff will suffer, and continue to suffer, irreparable harm as a result of this breach, and threatened breach. Plaintiff is threatened with losing the value of its trade secrets and confidential information and customer and prospective customer goodwill.

**COUNT TWO**
**MISAPPROPRIATION OF TRADE SECRETS – MTSA**
**(Against Defendant Duff)**

67. Plaintiff repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

68. Plaintiff's confidential information as set out above, constitutes trade secrets within the meaning of the Massachusetts Trade Secrets Act, M.G.L. c. 93, §§ 42, 42A-42G ("MTSA").

69. Plaintiff's trade secrets derive independent economic value from not being generally known to, or readily ascertainable by proper means by, the public, and other persons can obtain economic value from their disclosure and use.

70. At all relevant times, Plaintiff has taken reasonable and necessary measures to safeguard the secrecy and confidentiality of its information and business intelligence, including trade secrets. Such measures include, without limitation, promulgating corporate policies and requiring employees to contractually agree not to disclose confidential information.

71. Duff had substantial and ongoing access to trade secrets as a result of and during his employment with Plaintiff.

72. Upon information and belief, prior to his resignation, Duff accessed confidential and proprietary C-4 documents from Company systems that contained trade secrets.

73. Upon information and belief, Duff retained confidential information and trade secrets after he accepted employment at L2T.

74. Duff's memory retains Plaintiff's trade secrets after he ceased being employed by Plaintiff.

75. Upon information and belief, Duff disclosed trade secrets to L2T and/or has misappropriated or threatens to misappropriate trade secrets through his employment with L2T in violation of the MTSA.

76. Upon information and belief, accessing, retaining, and failing to return Plaintiff's trade secrets and confidential documents, Duff acquired and retained Plaintiff's trade secrets through improper means.

77. Duff's conduct was willful and malicious within the meaning of M.G.L. c. 93 § 42B(b).

78. By misappropriating and/or using trade secrets, Duff has created or will create an unfair advantage for L2T in competing with Plaintiff.

79. As a result of Duff's violation of the MTSA, Plaintiff has been injured and will continue to be damaged by losses.

**COUNT THREE**
**MISAPPROPRIATION OF TRADE SECRETS – DTSA**
**(Against Defendant Duff)**

80. Plaintiff repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

81. Plaintiff's confidential information, as set out above, constitutes trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA").

82. Plaintiff's trade secrets derive independent economic value from not being generally known to, or readily ascertainable by proper means by, the public, and other persons can obtain economic value from their disclosure and use.

83. The trade secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce.

84. At all relevant times, Plaintiff has taken reasonable and necessary measures to safeguard the secrecy and confidentiality of its information and business intelligence, including trade secrets. Such measures include, without limitation, promulgating corporate policies and requiring employees to contractually agree not to disclose confidential information.

85. Duff had substantial and ongoing access to trade secrets as a result of and during his employment.

86. Upon information and belief, prior to his resignation, Duff accessed confidential and proprietary C-4 documents from Company systems that contained trade secrets, including documents that he would not have needed in the ordinary course of performing his job duties.

87. Upon information and belief, Duff retained trade secrets after he accepted employment at L2T.

88. Duff's memory retained trade secrets after he ceased being employed by Plaintiff.

89. Upon information and belief, Duff disclosed trade secrets to L2T and/or has misappropriated or threatens to misappropriate trade secrets through his employment with L2T in violation of the DTSA.

90. Upon information and belief, accessing, retaining, and failing to return Plaintiff's trade secrets and confidential documents, Duff acquired and retained Plaintiff's trade secrets through improper means.

91. Duff's conduct was willful and malicious.

92. By misappropriating and/or using trade secrets, Duff has created an unfair advantage for L2T in competing with Plaintiff.

93. As a result of Duff's violation of the DTSA, Plaintiff has been injured and will continue to be damaged.

## COUNT FOUR
## BREACH OF FIDUCIARY DUTY AND/OR DUTY OF LOYALTY
## (Against Defendant Duff)

94. Plaintiff repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

95. Plaintiff employed Duff in a position of significant trust and confidence.

96. Duff owed Plaintiff a duty of loyalty that included, but was not limited to, a duty to act in Plaintiff's best interests.

97. During his employment with Plaintiff, Duff owed Plaintiff a continuing duty of loyalty, which included, but was not limited to, safeguarding Plaintiff's confidential information and trade secrets, and not interfering with, or taking actions that would disrupt, its business operations or cause a competitive disadvantage.

98. Upon information and belief, during his employment with Plaintiff, Duff acquired Plaintiff's confidential information with the intent of retaining such information and using it for the benefit of L2T, a direct competitor of C-4.

99. As a direct and proximate result of Duff's conduct, Plaintiff sustained damages and is threatened with sustaining immediate and irreparable injury, including, but not limited to, compensation and value of benefits paid and provided to Duff during his period of disloyalty, losses in profits and revenues, losses of business relations with current and prospective customers, and loss of competitive business advantage, opportunity, and/or expectancy.

100. Duff's wrongful conduct was willful, malicious, and done in conscious disregard of Plaintiff's rights.

## COUNT FIVE
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
## (Against Defendant L2T)

101. Plaintiff repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

102. Plaintiff has a valid and binding contract with Duff.

103. Upon information and belief, L2T knew about the Agreements, and knowingly and intentionally interfered with Duff's performance of the Agreements by directing and otherwise inducing Duff to breach them.

104. L2T's interference, in addition to being intentional, was improper in motive or means.

105. L2T's interference caused harm to Plaintiff in the form of damages in an amount to be determined at trial.

106. In addition to having suffered damages, Plaintiff has been placed at risk of irreparable harm to its business reputation, goodwill, and the compromise of its confidential information which cannot adequately be redressed by monetary relief alone; therefore, permanent injunctive relief is warranted.

**COUNT SIX**
**TORTIOUS INTERFERENCE WITH ADVANTAGEOUS RELATIONS**
**(Against Defendants Duff and L2T)**

107. Plaintiff repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

108. Plaintiff had advantageous relationships and/or economic expectancies in various clients and dealers.

109. Duff and L2T knew about these relationships.

110. Duff interfered with Plaintiff's advantageous relationships and/or economic expectancies by retaining and using Plaintiff's confidential information and trade secrets for the benefit of L2T and using that information to compete against Plaintiff.

111. L2T interfered with Plaintiff's advantageous relationships and/or economic expectancies by employing Duff even with knowledge of his contractual obligations to Plaintiff

and by utilizing and benefiting from the confidential information and trade secrets that Duff obtained from his employment with Plaintiff.

112. Defendants' interference, in addition to being intentional, was improper in motive and means.

113. Defendants' interference caused harm to Plaintiff in the form of damages in an amount to be determined at trial.

114. In addition to having suffered damages, Plaintiff has been placed at risk of irreparable harm to its business reputation, goodwill, and the compromise of its confidential information which cannot adequately be redressed by monetary relief alone; therefore, permanent injunctive relief is warranted.

**COUNT SEVEN**
**VIOLATION OF G.L. C. 93A, §§ 2, 11**
**(Against Defendant L2T)**

115. Plaintiff repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

116. Plaintiff and L2T are engaged in the conduct of trade or commerce within the meaning of G.L. c. 93A, §§ 1 and 11.

117. The above-described actions of L2T constitute unfair methods of competition and unfair or deceptive acts or practices prohibited by G.L. c. 93A, § 2.

118. Such actions occurred substantially and primarily within the Commonwealth of Massachusetts.

119. Such actions were conducted willfully and knowingly.

120. As a direct and proximate result of L2T's willful and knowing violations of G.L. c. 93A, § 2, C-4 has suffered loss of money or property, and is entitled to three times actual damages, attorneys' fees and costs.

121. Pursuant to G.L. c. 93A, § 11, C-4 is also entitled to permanent injunctive relief to prevent additional loss of money or property that may be caused by L2T's unfair methods of competition and unfair or deceptive acts or practices.

## REQUESTS FOR RELIEF

**WHEREFORE,** Plaintiff requests that this Court:

1. Enter an order that Duff and all parties in active concert or participation with him be preliminarily and permanently enjoined from:

(a) performing services for L2T anywhere in the United States for twelve (12) months following the entry of an order by this Court;

(b) disclosing or using any trade secrets or Confidential Information in violation of the Operative Agreement;

(c) recruiting, soliciting, or hiring any employee, consultant, vendor, or independent contractor who performed services for Plaintiff, or inducing or attempting to induce any such employee, consultant, vendor, or independent contractor, to discontinue employment or other business relationship with Plaintiff for a period of twenty-four (24) months following the termination of Duff's employment at Plaintiff;

(d) contacting any individual or entity that was a Customer or a Prospective Customer of C-4 Analytics that Duff serviced, had contact with, learned the identity of, or learned Confidential Information about during his/her employment at C-4 for the purpose of soliciting the sale of Competing Services to such individual or entity and/or to divert any portion of that individual's or entity's business away from C-4; and

(e) otherwise engaging in any conduct which violates any of the Agreements, but particularly the Operative Agreement.

2. Enter an order that Duff and all parties in active concert or participation with him be required to return to Plaintiff all originals and all copies of Plaintiff's trade secrets, Confidential Information, or other property that may exist, in any form, that are in his possession, custody or control as set forth in Section 16 of the Operative Agreement.

3. Enter an order that Duff and all parties in active concert or participation with him be required to explain any use or disclosure of trade secrets or confidential information in sufficient detail to enable Plaintiff to track down and recover all misappropriated information.

4. Award Plaintiff damages in an amount to be determined at trial.

5. Enjoin Duff upon principles of equity, award Plaintiff damages and exemplary damages, and award Plaintiff attorneys' fees, as well as any other remedy available pursuant to the MTSA and/or DTSA.

6. Award Plaintiff damages in an amount to be determined at trial in the form of compensatory, unjust enrichment, actual, consequential and punitive damages.

7. Any such other and further relief that the Court deems fit and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims raised in its Complaint that are so triable.

Respectfully submitted,

C-4 ANALYTICS, LLC

By its attorneys,

***/s/ Ryan W. Jaziri***

Ryan W. Jaziri (BBO# 681512)
Shane Goodrich (BBO# 696656)
Amy Ostiguy (BBO# 667279)
MORGAN, BROWN & JOY, LLP
28 State Street, 16th Floor
Boston, MA 02109
(617) 523-6666
(617) 367-3125 (fax)
rjaziri@morganbrown.com
sgoodrich@morganbrown.com
aostiguy@morganbrown.com

Dated: August 19, 2026